**SAULT STE. MARIE TRIBE OF LAKE SUPERIOR CHIPPEWA INDIANS, Plaintiff,**

v.

**UNITED STATES of America, United States Department of the Interior, and Bruce Babbitt, Secretary of the Interior, Defendants,**

**and**

**Little Traverse Bay Bands of Odawa Indians, Defendant–Intervenor.**

**No. 1:99–CV–799.**

United States District Court, W.D. Michigan, Southern Division.

Dec. 14, 1999.

Louis B. Reinwasser, Miller, Canfield, Paddock & Stone, Lansing, MI, Steven C. Kahn, Miller, Canfield, Paddock and Stone, PLC, Washington, DC, for Plaintiff.

Joan E. Meyer, Charles R. Gross, Edward J. Passarelli, U.S. Dept. of Justice Environment & Natural Resources, Washington, DC, James A. Bransky, Traverse City, MI, George Forman, for Defendants.

Kathryn L. Tierney, Brimley, Mi, for amicus Bay Mill Indian Community.

## OPINION

ROBERT HOLMES BELL, District Judge.

Plaintiff Sault Ste. Marie Tribe of Lake Superior Chippewa Indians ("Sault Tribe") filed this action under the Administrative Procedure Act, challenging the Department of Interior's decision to accept certain property owned by the Little Traverse Bay Bands of Odawa Indians ("LTBB") into trust. This matter is currently before the Court on the Sault Tribe's motion for summary judgment and for preliminary/permanent injunction, Intervenor LTBB's motion to dismiss or for summary judgment, and the government Defendants' motion for summary judgment.[1]

### I.

On August 30, 1999, in a related action brought by the Bay Mills Indian Community and the Sault Tribe, this Court enjoined operation of LTBB's Victories Casino in Emmet County, Michigan, ("the Property") until such time as the Property was taken into trust by the Department of the Interior. *Bay Mills Indian Community v. Little Traverse Bay Bands of Oda-*

---

1. The Court has also reviewed the amicus curiae brief filed by Bay Mills Indian Community.

*wa Indians,* 5:99–CV–88 (W.D.Mich. August 30, 1999).

On August 27, 1999, the Department of Interior made a final agency determination to take the Property into trust. The findings include the following:

It has been determined that the transaction comes within an exception to the prohibition on gaming on after-acquired lands contained in Section 20 of the Indian Gaming Regulatory Act because the lands are taken into trust as part of the restoration of lands for an Indian tribe (Little Traverse Bay Bands of Odawa Indians) that is restored to Federal recognition. In addition, it has been determined that the trust acquisition is mandated under the Little Traverse Bay Bands of Odawa Indians and the Little River Band of Ottawa Indians Act, 25 U.S.C. 1300k–1300k–7 (1994).

The notice of final agency determination was published in the Federal Register on September 2, 1999, pursuant to the requirement in 25 C.F.R. § 151.12(b) that notice be given to the public of the Secretary's decision to acquire land in trust at least 30 days prior to signatory acceptance of the land into trust.[2]

Prior to the expiration of the 30 day notice period the Sault Tribe filed this action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* In Count I Plaintiff challenges the Secretary of the Interior's ("the Secretary") determination that the Property meets the "restored lands" exception to the prohibition of gaming on lands acquired in trust by the Secretary contained in the Indian Gaming Regulation Act ("IGRA"), 25 U.S.C. § 2719. In Count II Plaintiff challenges the Secretary's determination that acceptance of the Property into trust was mandatory and not subject to the exercise of discretion in accordance with the procedures outlined in 25 C.F.R. §§ 151.10 and 151.11.

## II.

A party seeking to assert a claim for judicial review of administrative action under the APA must have standing to assert that claim in order to satisfy the actual case or controversy requirement of Article III, § 2 of the United States Constitution.[3] In addition, the APA limits the availability of judicial review to those who have been "aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. In other words, the plaintiff must establish that the injury he complains of falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for its complaint. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

Defendants have moved for dismissal of Plaintiff's complaint on the basis that Plaintiff lacks standing to challenge the Secretary's August 27, 1999, determination that the property should be taken into trust. Defendants contend that the Secretary's decision has not caused Plaintiff to suffer an invasion of a legally protected interest, and Plaintiff is not within the zone of interest sought to be protected by

---

**2.** 25 C.F.R. § 151.12(b) provides:

(b) Following completion of the Title Examination provided in § 151.13 of this part and the exhaustion of any administrative remedies, the Secretary shall publish in the Federal Register, or in a newspaper of general circulation serving the affected area a notice of his/her decision to take land into trust under this part. The notice will state that a final agency determination to take land in trust has been made and that the Secretary shall acquire title in the name of the United States no sooner than 30 days after the notice is published.

**3.** The irreducible constitutional minimum of standing contains three elements: a plaintiff must have suffered an injury in fact; the injury has to be fairly traceable to the conduct complained of; and there must be a likelihood that the requested relief will redress the alleged injury. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1016–17, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

the statute and regulations Plaintiff alleges were violated.[4]

Plaintiff has not articulated any legally protected interest which is affected by the taking of Property into trust. The only harm Plaintiff alleges is the negative economic impact that operation of LTBB's Victories casino will have on its own casinos. Plaintiff contends, nevertheless, that the decision to take the Property into trust and the decision to permit gaming on the Property, while technically two separate decisions, cannot be viewed independently for purposes of standing.

Although standing is generally a threshold inquiry, in light of the Court's determination below that Defendants are in any event entitled to summary judgment on the merits of Plaintiff's claims, resolution of the standing issue would not affect the ultimate disposition of this case. Accordingly, for purposes of this opinion, the Court will assume that Plaintiff has standing to bring this action.

### III.

Under the APA, agency action may be set aside if it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

■ Plaintiff contends that the Secretary's decision to take the Property into trust was arbitrary and capricious and not in accordance with law because the Secretary determined that acceptance of the Property into trust was mandatory and the Secretary failed to exercise the discretionary factors found in the Department's own regulations governing the acquisition of lands in trust status on behalf of a tribe, 25 C.F.R. §§ 151.10 and 151.11.

The Court's analysis begins with a review of the Little Traverse Bay Bands of Odawa Indians and Little River Band of Ottawa Indians Act ("LTBB Act"), 25 U.S.C. § 1300k *et seq.* In 1994, Congress reaffirmed Federal recognition of the LTBB in the LTBB Act. 25 U.S.C. § 1300k–2(a). As part of that recognition, Congress addressed the need to transfer land for the benefit of the Band. The LTBB Act explicitly requires the Secretary to accept property into trust by providing that the Secretary "shall" accept property for the benefit of the LTBB as long as there are no adverse legal claims on the property.[5] In contrast, subsection (c) provides that the Secretary "may" accept additional acreage in the Bands' service area. 25 U.S.C. § 1300k–4(c). Congress' use of the terms "shall" and "may" in subsections (a) and (c), makes it clear that Congress intended the acquisition of property under subsection (a) to be mandatory.

Despite the clear language of the LTBB Act, the Sault Tribe argues that the Secretary's interpretation of the statute as requiring the mandatory acceptance of property into trust is erroneous as a matter of law and arbitrary and capricious because it precludes the Secretary from considering the important factors outlined in 25 C.F.R. §§ 151.10 and 151.11.

Part 151 outlines the process for taking property into trust. Sections 151.10 and 151.11 require consideration of such factors as the proposed use of the property,

---

**4.** The government defendants argue that Plaintiff only lacks standing to challenge the Secretary's decision to take the Property into trust. The LTBB argues that Plaintiff also lacks standing to challenge the Secretary's determination that the Property meets the "restored lands" exception.

**5.** The LTBB Act provides:
   The Secretary **shall** acquire real property in Emmet and Charlevoix Counties for the benefit of the Little Traverse Bay Bands. The Secretary **shall also accept any real property located in those Counties** for the benefit of the Little Traverse Bay Bands if conveyed or otherwise transferred to the Secretary, **if** at the time of such acceptance, there are **no adverse legal claims** on such property including outstanding liens, mortgages or taxes owed.
   25 U.S.C. § 1300k–4(a) (emphasis added).

the use of adjoining property, the effect on civil and criminal jurisdiction, the effect on the non-Indian government's tax base.[6] 25 C.F.R. §§ 151.10 and 151.11. These regulations, however, by their own terms, apply only where "the acquisition is not mandated." The Secretary has determined that because the acquisition of property under § 1300k–4(a) of the LTBB Act is mandatory, the acquisition is exempt from the procedures that otherwise must be followed before land can be taken into trust for individual Indians or tribes.

■ An agency's interpretation of the applicable statute is entitled to substantial deference, particularly if the agency is charged with administering the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambig-

uously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. 2778 (footnotes omitted).

Plaintiff contends that under the Secretary's own interpretation of its regulations, the trust acquisition in this case is not mandatory and does allow for the exercise of some discretion. Plaintiff relies on a notice of a proposed amendment to 25 C.F.R. Part 151, that was published in the Federal Register on April 12, 1999. 64 F.R. 17574. The explanatory preamble to the proposed regulation provides:

The proposed regulation clarifies that an acquisition of title is "mandatory" if Congress has removed all discretion in determining whether to accept title to a particular tract of land. Situations in which all discretion has been removed

6. 25 C.F.R. § 151.10, entitled "On-reservation acquisitions," provides:

Upon receipt of a written request to have lands taken in trust, the Secretary will notify the state and local governments having regulatory jurisdiction over the land to be acquired, **unless the acquisition is mandated by legislation.** The notice will inform the state or local government that each will be given 30 days in which to provide written comments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.... The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when the land is located within or contiguous to an Indian reservation, **and the acquisition is not mandated:**
(a) The existence of statutory authority for the acquisition and any limitations contained in such authority;
(b) The need of the individual Indian or the tribe for additional land;
(c) The purposes for which the land will be used;

(d) If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs;
(e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;
(f) Jurisdictional problems and potential conflicts of land use which may arise; and
(g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.
(h) The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.
(emphasis added). 25 C.F.R. § 151.11, entitled "Off-reservation acquisitions," contains similar provisions.

include those situations in which Congress dictates that the Secretary "shall" acquire title to a parcel of land which is specifically identified by legal description, or to land which is purchased with certain, specified funds. In contrast, **a statute which merely directs that the Secretary "shall" accept title to unidentified land within some broader geographic boundary, e.g. within certain named counties, still allows for some discretion.** Hence we do not view acquisitions under such a statute as "mandatory" for the purposes of this regulation.

64 Fed.Reg. 17154, 17578 (Apr. 12, 1999) (emphasis added).

Plaintiff contends that because the proposed amendment is described as a clarification of what is meant by a "mandatory" acquisition, it is evidence of the Secretary's current interpretation of the law rather than a change in interpretation.

Despite Plaintiff's assertion that this proposed regulation clarifies rather than amends the Secretary's current interpretation of the LTBB Act, the Court observes that the proposed amendment, if interpreted to require the exercise of discretion before accepting property in trust under the second sentence of § 1300k–4(a),[7] would in fact suggest a change in the Secretary's interpretation of the LTBB Act. The Secretary has consistently interpreted the LTBB Act to require mandatory acceptance of property in trust in situations such as that presented in this case. For example, Defendants have submitted evidence that in 1997, in a memorandum discussing the LTBB's acquisition of the Mackinaw City Tracts, the Associate Solicitor stated that "the provisions of 25 C.F.R. § 151.3 and 151.10 are not applicable to the proposed acquisition of the Mackinaw City Tracts because Congress has made the acquisition mandatory and the Secretary lacks his usual discretionary authority that the criteria in Section 151.10

are intended to inform." The Secretary applied the same analysis to the acquisition of property in Manistee County for the Little River Band of Ottawa Indians in September 1998.

The proposed amendment Plaintiff relies so heavily on has not been adopted. The Department has not yet addressed the many comments it has received, nor has it determined whether to adopt, to amend, or to reject this proposed rule. Plaintiff has cited no authority suggesting that this Court should accord any weight to such a proposed rule. "It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound." *Commodity Futures Trading Comm. v. Schor,* 478 U.S. 833, 845, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Moreover, in light of the Secretary's consistent interpretation of the LTBB Act to require mandatory acceptance of property into trust under circumstances such as those presented in this case, the Court finds the proposed amendment to carry little weight.

In a final effort to persuade the Court to set aside the Secretary's determination, Plaintiff argues that if the Court accepts the Secretary's interpretation of the LTBB Act, the Secretary's mandate to acquire property in trust on behalf of the LTBB would be unlimited as to duration and to amount. Plaintiff raises the specter that the Secretary could be required to acquire all the Property in Emmet and Charlevoix Counties in trust on behalf of the LTBB.

Congress does not appear to be concerned with this possibility, and neither is this Court. Before property can be accepted by the Secretary on behalf of the LTBB, the LTBB must first acquire title to the property. There are practical limits on the LTBB's ability to do this. The

---

**7.** The Secretary contends that the additional requirement in the second sentence of § 1300k–4(a) that the Secretary accepted

"any" real property in the two counties distinguishes the LTBB Act from the highlighted language in the proposed regulation.

LTBB must be able to afford the property and it must be able to find a willing seller. Congress can also amend the statute to eliminate the mandatory provision if a concern arises about the extent of the property being acquired.

Upon consideration of the arguments presented, the Court concludes that the Secretary's interpretation of the LTBB Act's property acquisition procedures is not arbitrary or capricious. It is an eminently reasonable interpretation of the Act, and will not be set aside.

### Restored Lands

■ The Secretary's August 27, 1999, determination provided not only that the Property would be taken into trust, but also that the Property qualifies as "restored lands" under 25 U.S.C. § 2719(b)(1)(B)(iii), and as such can be used for gaming purposes. The Court is satisfied that this determination must also be upheld.[8] In the absence of some clear evidence that the Secretary's interpretation does not accord with Congressional intent, the Court must accord deference to the Secretary's determination as long as it is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

IGRA contains a general prohibition against gaming on lands acquired in trust by the Secretary:

> **Except as provided in subsection (b)** of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, . . . .

25 U.S.C. § 2719(a). Despite this general prohibition against gaming on property acquired in trust, IGRA contains an exemption for "restored lands." Subsection (b) provides in pertinent part that subsection (a) will not apply when lands are taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii).

The Secretary has determined that LTBB is an Indian tribe that has been restored to Federal recognition, and that the Property can accordingly be used for gaming.

The history of the LTBB is not in dispute. Much of the relevant history is contained in the Congressional findings made in the LTBB Act. Congress found that the LTBB is a descendant of, and political successor to, signatories of the 1836 Treaty of Washington and the 1855 Treaty of Detroit. 25 U.S.C. § 1300k(1). Members of the LTBB continue to reside close to their ancestral homeland as recognized in the 1836 and 1855 treaties, in an area now known as Emmet and Charlevoix Counties. 25 U.S.C. § 1300k(3). In 1935 and again in 1975, the LTBB filed for reorganization under the Indian Reorganization Act, 25 U.S.C. § 461 *et seq*. Despite their eligibility, they were denied the opportunity to reorganize. 25 U.S.C. §§ 1300k(5) & 1300k(8). As noted in the Pokagon Band of Potawatomi Indians Act, 25 U.S.C. § 1300j(6), agents of the Federal Government in 1939 made an administrative decision not to provide services or extend the benefits of the Indian Reorganization Act to any Indian tribes in Michigan's lower peninsula. Through the years the LTBB has continued its political and social existence with viable tribal governments. 25 U.S.C. § 1300k(6). The United States government, the government of the State of Michigan, and local governments have had continuous dealings with the recognized political leaders of the LTBB from 1836 to the present. 25 U.S.C. § 1300k(9). However, there is no dispute that LTBB was not contained on the official list of federally recognized Indian tribes prior to enactment of the LTBB Act.

---

8. Because the Court is upholding the Secretary's determination that the Property qualifies as "restored" lands under § 2719(b)(1)(B)(iii), the Court will not address the LTBB's alternative argument that gaming is also permissible under 25 U.S.C. § 2710(a)(1) or § 2710(a)(2)(B) because the site is within the boundaries of LTBB's Reservation as it existed on October 17, 1988, or is within LTBB's last recognized Reservation.

■ The starting point in interpreting a statute is the statutory language. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). Unless a statute is ambiguous, the plain meaning of the statute controls the court's interpretation. *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 842 (6th Cir.1994) IGRA contains no definition of the term "restored." Neither is the Court aware of any legislative history explaining the "restored" lands provision of 25 U.S.C. § 2719(b)(1)(B)(iii). Because Congress has not given the term any special meaning, the word should be construed according to its ordinary meaning. A plain reading of the term "restored" as it is used in IGRA supports the Secretary's determination that LTBB is an Indian tribe that has been "restored to Federal recognition."

Plaintiff contends that the term "restored" cannot be given its plain meaning because it has a specific meaning in Indian law. Plaintiff contends that the phrase "restored to federal recognition" is used exclusively to apply to those tribes whose Federal recognition was terminated by congressional action. Plaintiff contends that because the LTBB's termination was not the product of a specific legislative termination, LTBB cannot be a "restored tribe."

Plaintiff contends it is significant that the term "restored" was not used in the LTBB Act. Plaintiff has directed the Court's attention to several other acts enacted contemporaneously with the LTBB Act, where Congress did use the term "restore," and in each of those instances Congress was referring to the restoration of rights and privileges which were diminished or lost under a Congressional act. *See, e.g.*, 25 U.S.C. § 13001(b) and 25 U.S.C. 1300m–1(b), restoring federal rights and privileges to the Auburn Indian Tribe and the Paskenta Band of Nomlaki Indians that had been lost under the Act of August 18, 1958. Prior to enactment of the LTBB Act, the term was also applied to restore federal rights to tribes that had lost those rights under a Congressional statute. *See,* e.g., 25 U.S.C. § 1300g–2(b) (restoring federal rights and privileges to the Ysleta del Sur Pueblo that had been lost under the Tiwa Indians Act).

Plaintiff's reliance on these other Acts to construe the meaning of "restore" in IGRA is not convincing. While all of these statutes involve restoration of rights after Congressional termination, none of the acts defines the term "restore" to apply exclusively to such situations. Moreover, even if the term is construed to have a limited meaning in the statutes Plaintiff has cited, Plaintiff has not directed the Court to any language in the statutes or case law that would suggest that the term "restore" is to be construed in the same manner in all statutes affecting Indian tribes. The Court knows of no principle of statutory construction that would suggest that the special limitations given to a term in one statute should be grafted onto the term in another statute.

Furthermore, contrary to Plaintiff's suggestion that Congress only uses the term "restored" to apply to tribes that have been legislatively terminated, the term "restored" has in fact been used in other circumstances. For example, in 1994 Congress passed Pub.L. 103–323 (S1066), entitled "An Act to Restore Federal Services to the Pokagon Band of Potawatomi Indians" (codified at 25 U.S.C. § 1300j *et seq.*). Through this act to "restore" federal services, Congress affirmed recognition of the Pokagon Band of Potawatomi Indians, a tribe that, like the LTBB, had never been legislatively terminated.

As Judge Hillman observed in *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Atty. for Western Dist. of Mich.*, 46 F.Supp.2d 689 (W.D.Mich.1999) (Hillman, S.J.):

Congress itself has used the words "restore" and "restoration" interchangeably with "reaffirm" and "recognize" in the course of its actions to restore recognition of previously recognized tribes. The government has pointed to no standard, accepted and exclusive Congres-

sional use of the words "restore" and "restoration."

Instead, Congressional use of the words appears to have occurred in a descriptive sense only, in conjunction with action taken by Congress to accomplish a purpose consistent with the ordinary meaning of the words. In no sense has a proprietary use of "restore" or "restoration" been shown to have occurred. *Id.* at 698 (citations omitted).[9]

Moreover, the significance Plaintiff attempts to attach to the distinction between instances where federal recognition was legislatively terminated and instances where federal recognition was administratively terminated, is undermined by the evidence Plaintiff has produced. Attached to Plaintiff's response brief is a House Report from the Committee on Natural Resources that accompanied the 1994 LTBB Act. The report states that "[t]he Bureau of Indian Affairs and its predecessors have treated these tribes as if they had been legislatively terminated by the Congress through its ratification of Article 5 of the 1855 Treaty of Detroit." 103rd Cong. 2nd Sess., H.R.103–621, at p. 7. The LTBB Act was enacted to correct the government's wrongful termination of the LTBB's tribal status. Because the LTBB was being treated as though it had been legislatively terminated, the Court finds no basis for treating it differently than those tribes that were in fact legislatively terminated. Plaintiff has not articulated any reason why Congress would treat a tribe that was administratively terminated any differently than a tribe that was legislatively terminated. The impact on the tribe—lack of federal recognition and the rights and privileges that go with federal recognition—is the same.

The Secretary has consistently applied the "restored to federal recognition" language of § 2719(b)(1)(B)(iii) to apply to tribes that were administratively terminated and then reaffirmed by Congress. For example, in a memorandum dated November 12, 1997, the Associate Solicitor, Division of Indian Affairs, concluded that LTBB is a restored tribe and that its Mackinaw City Tracts qualified as "restored" lands within the meaning of Section 20 of IGRA. In 1998, the Secretary determined that the Little River Band of Ottawa Indians, a band with a similar procedural history as the LTBB, was a restored tribe for purposes of § 2719(b)(1)(B)(iii).

The Secretary's determination that the LTBB is a restored tribe for purposes of IGRA § 2719(b)(1)(B)(iii) is not arbitrary or capricious, or in violation of the law. Because the Secretary has given this provision a reasonable construction, it will not be set aside.

For the reasons stated here in, Defendants' motions for summary judgment will be granted, Plaintiff's motion for summary judgment and injunctive relief will be denied, and this case will be dismissed in its entirety.

An order and judgment consistent with this opinion will be entered.

### ORDER AND JUDGMENT

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Plaintiff Sault Ste. Marie Tribe of Lake Superior Chippewa Indians' motion for summary judgment and for preliminary/permanent injunction (Docket # 6) is **DENIED.**

**IT IS FURTHER ORDERED** that Intervenor Defendant Little Traverse Bay Bands of Odawa Indians' motion to dismiss

9. In *Grand Traverse Band* the court rejected the government's argument that the restored tribe exception is limited to tribes whose recognition was restored by way of Congressional action or by order of the court, not by agency acknowledgment. Although the government Defendants disagree with the granting of restored status to the Grand Traverse Band, which went through the Part 83 federal acknowledgment process, they do not disagree with the court's analysis in *Grand Traverse Band* to the extent it is applied to LTBB, a tribe whose recognition was reaffirmed by Congressional action.

or for summary judgment (Docket # 11) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants the United States of America, the U.S. Department of Interior, and the Secretary of the U.S. Department of Interior's cross-motion for summary judgment (Docket # 20) is **GRANTED.**

**IT IS FURTHER ORDERED** that **JUDGMENT** is entered in favor of Defendants and this action is **DISMISSED** in its entirety.