Robert SHAIN and James
Sheetz, Plaintiffs,

v.

Ann VENEMAN, in her capacity as Secretary of the United States Department of Agriculture, Gilbert Gonzalez, Jr., and David Dowdy, in their capacities within the United States Department of Agriculture, Defendants.

No. 4:02–CV–40645.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 19, 2003.

Wallace L. Taylor, Cedar Rapids, IA, for plaintiffs.

Christopher D. Hagen, United States Attorney, Des Moines, IA, for defendants.

Robert W. Goodwin, Goodwin Law Office, Ames, IA, for movant.

## ORDER ON DEFENDANTS' MOTION TO DISMISS

GRITZNER, District Judge.

Before the Court is Defendants' Motion to Dismiss or in the Alternative for Summary Judgment (Clerk's No. 3). The Court first addresses the motion to dismiss. Having considered the motion, Plaintiffs' resistance, a corresponding reply, documents related to amicus curiae briefs, and statements at oral argument, the Court grants Defendants' Motion to Dismiss. Accordingly, the Defendants' alternative motion for summary judgment is denied as moot.

### I. PROCEDURE

This case arises out of the construction of two sewage lagoon ponds near the City of Kinross, Iowa, which Plaintiffs allege were improperly funded and improvidently located in a 100–year flood plain. Plaintiff Shain first initiated this lawsuit on December 24, 2002, against Ann Veneman, Secretary of Agriculture, and others working in their capacity as employees of the United States Department of Agriculture ("USDA"), all of whom the Court collectively refers to as "the Government".

After an extension of time in which to move or respond to the original Complaint, the Government moved the Court to dismiss the case, or alternatively to grant summary judgment. The essential basis for the motion was the Government's assertion that Plaintiff Shain lacked the necessary standing to bring this suit.

Shain requested and did receive an extension until April 23, 2003, in which to resist the Government's motion. On April 25, 2003, two days past the extended dead-

line, and despite the directive in Fed. R.Civ.P. 15(a) to seek leave of court before amending a pleading after a responsive pleading has been filed, Plaintiff Shain filed an Amended Complaint without leave of Court, adding James Sheetz as a Plaintiff and also inserting a new paragraph to seek review of administrative action pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).[1]

The Government subsequently amended its initial motion, maintaining Plaintiffs lacked standing to sue, and also argued Plaintiffs could not seek judicial review of agency action since they had not exhausted all administrative remedies. Plaintiffs have filed a resistance to this, citing *Darby v. Cisneros*, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), and arguing the exhaustion of administrative remedies is not required since Plaintiffs are not program participants of any USDA programs. Plaintiffs reassert their contention that they have standing in this case.

Oral argument on the Government's amended motion was set and then rescheduled for July 29, 2003. A few days before the hearing, the City of Kinross and the Rural Utilities Services Systems ("RUSS") filed a motion seeking leave to file an amicus curiae brief in support of the Government. After the July 29, 2003, oral arguments, the Court left the record open to allow Plaintiffs the ability to respond to the amicus brief filed by Kinross and RUSS.[2] Plaintiffs did respond, arguing that under the Administrative Procedure Act and under *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999), they are entitled to the full array of equitable remedies. Kinross and RUSS, as well as the Government, have each replied to Plaintiffs' response.

## II. MATERIAL FACTS

In August of 1997, Kinross was contacted by the Iowa Department of Natural Resources ("DNR") about complaints the DNR received regarding discharge of waste-water into a creek near Kinross related to a Kinross resident's individual septic tank. Kinross was not given a citation but did begin analyzing the possibility of creating a community sewer system. Originally, funding for this community system was sought through community block grants via the USDA, where the Wapello Rural Water Association would be the owner/operator; however, this arrangement proved unsuccessful.

In 2000, Kinross began working with RUSS, an intergovernmental agency, to secure the necessary funding to create a sewer system.[3] RUSS obtained funding through the Iowa Department of Economic Development and the USDA. Eventually, RUSS received a loan not to exceed $128,000 and a grant not to exceed $367,500 for the sewer lagoon project. An additional grant of $89,000 from a Community Development Block Grant ("CDBG")

---

1. As the Government does not resist the amendment, and amendments are "freely given when justice so requires," the Court has allowed this amendment. Fed.R.Civ.P. 15(a).

2. Plaintiffs resisted the motion for leave to file the amicus brief. However, given the obvious interest of Kinross and RUSS and the legal nature of the issue, the Court overruled that resistance.

3. The intergovernmental agreement between RUSS and Kinross allowed RUSS to be the borrower and recipient of the necessary funding for the Kinross sewer. The intergovernmental agreement was made pursuant to Chapter 28E of the Code of Iowa. The Court notes that Chapter 28E of the Iowa Code provides that "[n]o agreement made pursuant to this chapter shall relieve any public agency of any obligation or responsibility imposed upon it by law ...." *See* Iowa Code § 28E.7.

was also provided to help fund the sewer lagoon project.

Two sewage retention ponds were built on land adjacent to the City of Kinross. During oral argument, the parties stipulated that construction of both sewage lagoons was complete and the lagoons were operational. The Court notes that the main impact this case has had on the project thus far relates to the USDA not fully disbursing the loan for the project. While this case has been pending, Kinross obtained private funding to address the expenses related to the sewer lagoon project.

Under 7 U.S.C. § 1926(a)(1), Ann Veneman, as Secretary of the USDA, and those acting under her delegated authority, are authorized to make grants for the financing of projects addressing the collection, treatment, or disposal of waste in rural areas. Pursuant to 42 U.S.C. § 4002, states or local communities, as a condition of future federal financial assistance, must participate in the National Flood Insurance Plan ("NFIP")[4] administered by the Federal Emergency Management Agency ("FEMA"). Under 42 U.S.C. § 4106, a federal officer or agency shall not approve financial assistance for acquisition or construction purposes which will be used in any area identified as having special flood hazards unless the community participates in the NFIP. In this case, Plaintiffs allege that by authorizing and approving a loan for the sewage lagoons, the Government violated section 4106. Plaintiffs contend the lagoons were built in a 100–year flood plain, and since Kinross does not participate in the NFIP, Kinross was and is ineligible to receive federal financial assistance to construct the sewage lagoons in question. *See* 42 U.S.C. § 4002 and 42 U.S.C. § 4106.

To avoid "to the extent possible the long and short term adverse impacts associated with the occupancy and modification of flood plains and to avoid direct or indirect support of flood plain development wherever there is a practicable alternative," Executive Order 11988 ("Ex.11988") requires that "[e]ach agency shall provide leadership and shall take action to reduce the risk of flood loss ... in carrying out its responsibilities for ... (2) providing Federally undertaken, financed, or assisted construction and improvements ...." *See* Ex. 11988, § 1. Section 2 of Ex. 11988 places on each agency the responsibility to evaluate the potential effects of any actions it may take in a flood plain by: (a)(1) determining whether the action proposed will take place in a flood plain before any action is taken ... as determined according to the Department of Housing and Urban Development flood plain map of the area. Ex. 11988, § 2(a)(1). Where an agency determines or proposes to "conduct, support, or allow an action ... in a flood plain, the agency shall consider alternatives to avoid adverse effects and incompatible development in the flood plains." Ex. 11988 § 2(a)(2). In this case, Plaintiffs also allege the Government violated Ex. 11988 by not considering alternative sites and not providing the requisite leadership. Instead, Plaintiffs argue the Government took the word of the Kinross project engineer that the area proposed for the construction of the sewage lagoons was not within a 100–year flood plain before approving and distributing funding for the project.

### III. APPLICABLE LAW

■ Article III of the Constitution restricts "judicial power" to the resolution of

---

4. For further explanation of the NFIP, *see Rojek v. FEMA*, 234 F.Supp.2d 999 (S.D.Iowa 2002).

"cases" and "controversies". *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). To ensure a court is passing upon a true case or controversy, "a litigant [must] have standing to challenge the action sought to be adjudicated in the lawsuit." *Id.* If plaintiffs cannot "demonstrate the requisite case or controversy between themselves personally and respondents, 'none may seek relief on behalf of himself ....'" *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

"In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* at 498, 94 S.Ct. 669. "Standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *See Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Warth,* 422 U.S. at 498, 95 S.Ct. 2197). Both dimensions are concerned with and address "the proper—and properly limited—role of the courts in a democratic society." *Warth,* 422 U.S. at 498, 95 S.Ct. 2197. Whether suing under a particular statute or seeking judicial review under the Administrative Procedure Act, a party must have standing. *See Melissa Indus. Dev. Corp. v. North Collin Water Supply Corp.,* 256 F.Supp.2d 557, 566 (E.D.Tex.2003) (discussing the requirement that to seek judicial review of agency action under the Administrative Procedure Act, in addition to meeting the constitutional requirement of Article III standing, one must also satisfy prudential standing as well).

Satisfying Article III's case or controversy requirement, the irreducible constitutional minimum of standing requires a plaintiff generally to demonstrate three things. *Rosebud Sioux Tribe v. McDivitt,* 286 F.3d 1031, 1036 (8th Cir.2002) (citing *Bennett,* 520 U.S. at 162, 117 S.Ct. 1154). A plaintiff must show:

> (1) that the plaintiff ha[s] suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there [is] a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court, and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and the reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501, 95 S.Ct. 2197.

## IV. DISCUSSION

Plaintiff James Sheetz rents and farms 90 acres of land just to the north, west, and south of the sewage lagoons. The 100–year flood plain at issue in this case is for a tributary to a creek near Kinross called Smith Creek. The tributary flows through the land Sheetz rents just south of the lagoons, flowing adjacent to the western edge of the lagoons.

Sheetz is concerned that, were this land to flood, his farm yield would diminish. Sheetz has also used this land to graze cattle and argues he will be harmed if this

land floods, because the amount of pasture available for grazing will diminish. Should a flood occur, the harvested stocks from his farming operations could become contaminated with effluent from the lagoons, and he would be unable to graze his cattle there.

Plaintiff Robert Shain has property approximately 1000 feet (as measured by his "pacing off the steps") downstream from the lagoon system property. The primary concern of Shain is related to potential contamination on his property should the area around the sewage lagoons flood.

Plaintiffs identify the "injury in fact" involved in this case as being one of displacement of flood waters. Elaborating, Plaintiffs contend that filling the flood plain would force the water elsewhere, increasing the risk of flooding in an area that previously had a lower risk of flooding. Pointing to *Laidlaw*, 528 U.S. at 183–84, 120 S.Ct. 693, Plaintiffs argue they have, in similar fashion to the plaintiffs in *Laidlaw*, articulated reasonable concerns about being affected by the actions taken by the Government here, which Plaintiffs believe satisfies the "injury in fact" requirement of Article III standing. Plaintiffs aver the area around Smith Creek has flooded in the past even when the lagoons were not there, and their use of the land in close proximity to the lagoons adequately identifies a specific and particularized reasonable concern of an injury they will suffer.

As indicated, Plaintiffs have amended their original Complaint and now seek judicial review of agency action pursuant to the Administrative Procedure Act. The requested relief includes a declaratory judgment that the Government has violated federal law, an injunction requiring the Government to withdraw federal funding for the project, and an injunction order that the lagoons be removed and the land on which they are located be restored.

## A. The Constitutional Components of Article III Standing.

Plaintiffs rely exclusively on *Laidlaw* to support their contention that they have the requisite standing to bring forth this case. Specifically, Plaintiffs have extracted from *Laidlaw* the sentence, "[i]n contrast, the affidavits and testimony presented by FOE ["Friends of the Earth"] in this case assert that Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests." *Laidlaw*, 528 U.S. at 183–84, 120 S.Ct. 693. Plaintiffs argue that under *Laidlaw*, articulating reasonable concerns about a defendant's actions sufficiently alleges an injury in fact, and, here, Plaintiffs assert proximity to the lagoon site and use of the land adjacent to the lagoons, coupled with the fact that the area has flooded previously even without the existence of the lagoons, sufficiently satisfies the injury in fact prong of standing.

At oral argument, although acknowledging that this case hinges on the determination of the standing issue, Plaintiffs' counsel merely reiterated the position that standing has been established since Plaintiffs use the land surrounding the lagoons and have articulated reasonable concerns about how the Government's activities affect them. Thus, the entirety of Plaintiffs' standing argument consists of their belief that, in *Laidlaw*, the Supreme Court found that a plaintiff has standing if he has a reasonable concern about the effects of a defendant's actions on the plaintiff's interests.

The Court finds the Plaintiffs have failed to demonstrate standing in two respects. First, they have not shown they are at risk of suffering an "actual or imminent" inju-

ry. Second, the Court finds that in this case insurmountable problems exist with the redressability prong of standing.

### 1. *Injury in Fact.*

In this case, the whole basis of Plaintiffs' injury relates to two sewage lagoons having been built in a 100–year flood plain of a tributary to Smith Creek. Plaintiffs' alleged injury might occur if the area is deluged with a 100–year flood. The occurrence of a 100–year flood, by its very nature, however, is speculative and unpredictable. *See, e.g., DiLaura v. Power Authority of New York,* 654 F.Supp. 641, 647 (W.D.N.Y.1987) (stating, in the context of denying a preliminary injunction, that "[t]his Court does not question that flooding in the past has inflicted substantial injury to property and that *future flooding at some indeterminate future date* may again cause substantial injury", and going on to classify the risk of future flooding as a *"speculative future injury."*) (emphasis added). The Court finds in this case that Plaintiffs' alleged injury might potentially occur only if and when the area is impacted by a 100–year flood, if that event creates flooding on the Plaintiffs' property that would not have resulted in the absence of the lagoon structures and/or contamination on the Plaintiffs' property. Thus, Plaintiffs assert an injury related to a future harm, rather than a harm which presently exists. This is a crucial factual distinction from the facts of *Laidlaw.*

In *Laidlaw,* Friends of the Earth ("FOE"), an environmental group, sued Laidlaw, a hazardous waste incinerator facility located in South Carolina. *See Laidlaw,* 528 U.S. at 175–76, 120 S.Ct. 693. The case concerned the Clean Water Act, and, pursuant to this Act, Laidlaw had received a National Pollution Discharge Elimination System ("NPDES") permit.

*Id.* at 174–75, 120 S.Ct. 693. Its NPDES permit allowed Laidlaw to discharge treated water into the North Tyger River. *Id.* at 176, 120 S.Ct. 693. The permit did, however, place limits on Laidlaw's ability to discharge several pollutants into the river, "including—of particular relevance ... mercury, an extremely toxic pollutant." *Id.* Laidlaw consistently failed to meet the discharge limits fixed by its NPDES permit on mercury discharges. *Id.* The district court found Laidlaw had violated mercury limits on 489 occasions between 1987 and 1995. *Id.* The Supreme Court, therefore, found the excessive mercury levels discharged by Laidlaw posed a present or imminent, rather than future, harm to those near the river.[5]

This finding that the river was currently polluted with mercury and thus posed a current, imminent danger was crucial to the court's finding of standing. Viewing the mercury presence in the river as posing an imminent danger meant members of FOE and Citizens Local Environmental Action Network, Inc. ("CLEAN"), who would like to "fish, camp, swim, or picnic in and near the river" but would not because of concern that the water was polluted by Laidlaw's discharges, *id.* at 704, members who would like to purchase a home near the river but did not intend to do so, in part because of Laidlaw's discharges, *id.* at 705, members who would like to use "the land surrounding [the River] for recreational purposes [but would not out of concern] that the water contained harmful pollutants, *id.,* or members who complained that property values near Laidlaw facilities were lower than property values located further from Laidlaw facilities, had identified non-speculative injuries sufficient to satisfy standing." By viewing the elevated mercury in the water as creating an imminent danger, the court was able to

---

**5.** The Court notes that in *Laidlaw,* while the district court found FOE members did have standing, it was "by the very slimmest of margins." *Laidlaw,* 120 S.Ct. at 702.

conclude that "the affidavits and testimony presented by FOE in this case assert that Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected the asserted recreational, aesthetic and economic interests." *Id.* The Supreme Court was satisfied that FOE and CLEAN members had presented more than "general averments" and "conclusory allegations" and had gone beyond the mere speculation which the Court had previously held was insufficient to show injury in fact. *Id.* In the present case, however, there is nothing imminent about the Plaintiffs' asserted injury; it will only potentially occur when an unpredictable 100–year flood occurs.

█ Moreover, in this case, Plaintiffs complain about the Government inaction (of not enforcing various statutes and Ex. 11988) as it relates to others such as Kinross and RUSS. The Supreme Court has been clear that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Clearly, the instant case, concerned with future harm arising from a potential future flood, is unlike *Laidlaw,* where the court viewed the North Tyger River as posing an imminent danger as a result of Laidlaw exceeding its NPDES permit for mercury discharge. The Court finds this case more akin to *Lujan* rather than *Laidlaw.*

In *Lujan,* members of the environmental group, Defenders of Wildlife ("DOW"), claimed injury by not being consulted with respect to funding activities the United States government was engaging in abroad. *Lujan,* 504 U.S. at 562, 112 S.Ct. 2130. DOW alleged the funding increased "the rate of extinction of endangered and threatened species." *Id.* In an attempt to establish the alleged injury, affidavits were introduced indicating DOW members hoped to someday visit impacted areas, as they had previously, but were afraid many animals would likely be extinct by the time they traveled. *Id.* at 563, 112 S.Ct. 2130. A theme throughout the affidavits was the fact that the DOW members had no present intentions, or current plans, on traveling to the areas, but rather had intentions on traveling to the areas in question "some day". *Id.* at 564, 112 S.Ct. 2130.

The Supreme Court decided "an intent to return to the places ... visited before—where [the DOW members] will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough [to show an actual and imminent injury]." *Id.* The Court determined that these "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury." *Id.* (emphasis in original). In a lengthy footnote, the Supreme Court explained that "[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III ...." *Id.* at n. 2.

█ The injury asserted here which is based on the occurrence of a 100–year flood at some unknown point in the future, with particular effects upon the property of the Plaintiffs, is the exact type of *"possible future injury* [that does not] satisfy the requirements of Art[icle] III." *See Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (emphasis added). Just as "allegations of future injury contingent on a plaintiff having an encounter with police wherein police would administer an allegedly illegal 'chokehol[d]'" have been inadequate to demonstrate an imminent injury, *see id.* (citing *Los Angeles v. Lyons,* 461 U.S. 95, 105, 103

S.Ct. 1660, 75 L.Ed.2d 675 (1983)), so, too, are allegations of future injury contingent upon the occurrence of a 100–year flood with particular results. The Court finds the injury alleged here is not the type of injury that is "certainly impending" to constitute an actual or imminent injury in fact. *Id.*

### 2. *Redressability.*

■ An aspect of standing that must be met in every case is that "it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. In this case, Plaintiffs have also failed to establish this aspect of standing. In its pleading papers, the Government argues that, to the extent Plaintiffs have adequately identified an injury in fact, the injury arises from the actions of RUSS and Kinross, rather than the actions of the Defendants in this case. While conceding that this Court is able to enjoin the funding, the Government maintains the Court cannot order the Defendants in this case to dismantle or remove the lagoons.

Plaintiffs cite *Dep't of the Army,* 525 U.S. 255, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999), as indicating that under the Administrative Procedure Act, as long as a plaintiff is not seeking money damages, a plaintiff is able to receive very broad specific relief. Under this authority, and under the Administrative Procedure Act itself, which allows a court to hold agency action unlawful and set it aside, Plaintiffs maintain this provides this Court the authority to order the Defendants to dismantle the sewage lagoons. In *Dep't of the Army,* however, the Supreme Court actually denied an equitable lien request, finding it was more compensatory and, therefore, sovereign immunity barred the requested remedy. *See Dep't of the Army,* 525 U.S. at 263–65, 119 S.Ct. 687, suggesting *Dep't of the Army* does not stand for the position that someone bringing an action under the Administrative Procedure Act "is entitled to the full array of equitable remedies", as Plaintiffs suggest.

■ Moreover, as the Government has pointed out, a court must limit itself to the consideration of only those possible "remedies aimed at securing prompt compliance with the statute being violated . . . ." *See Center for Biological Diversity v. Pirie, Jr.,* 201 F.Supp.2d 113, 120 (D.D.C.2002). Here, Plaintiffs have sued under statutes concerning available funding for communities not participating in the NFIP and under an Executive Order requiring agencies to provide leadership when flood plain construction occurs. Assuming these statutes and the Executive Order have been violated, while the Court believes enjoining the funding would adequately address the violations of improper funding, this would still not redress Plaintiffs' alleged injury. As indicated, during oral argument, the parties stipulated that construction of the lagoons was complete and both lagoons are currently operational. Since the commencement of this case, Kinross has secured private funding for the costs associated with the lagoons. Merely enjoining the funding of the sewer lagoons does not redress Plaintiffs' alleged injury.

In their pleading papers, Plaintiffs recognize this and argue that no remedy other than removing the lagoons is adequate for the violations of law in this case. However, at oral argument, Plaintiffs virtually conceded that this current lawsuit may not address all of their needs and acknowledged they may need to go elsewhere in order to have the lagoons removed. In any event, the Court does not believe that ordering the destruction of the lagoons would secure "prompt compliance" with Ex. 11988, the Executive Order alleged to have been violated. *See Center for Biological Diversity,* 201 F.Supp.2d at 120. In sum, to meet the redressability prong of standing, the law requires "it be likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw,* 528 U.S. at 181, 120 S.Ct. 693. Plaintiffs have failed to demonstrate beyond mere speculation that a favorable decision is likely to redress the injury they allege.

### V.  CONCLUSION

For the foregoing reasons, the Court finds Plaintiffs lack standing to bring this case. Accordingly, the Defendants' Motion to Dismiss (Clerk's No. 3) is **granted.**[6] Defendants' Alternative Motion for Summary Judgment is denied as moot. **The case is dismissed.**

**IT IS SO ORDERED.**

---

**6.** Deciding the case on standing grounds means the Court does not further address other arguments related to judicial review under the Administrative Procedure Act, such

as what impact, if any, *Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) has on the facts of this case, after the enactment of 7 U.S.C. § 6912(e).